# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **Thomas E. Doughty, individually and on behalf of the classes,** | § | |
| | § | |
| | § | |
| Plaintiff, | § | CA No.: 1:26-cv-1523-DAE |
| | § | |
| v. | § | |
| | § | |
| | § | Class Action |
| **The Baldwin Group Personal Insurance, LLC, f/k/a Guided Insurance Solutions, LLC and Live Calls Network, LLC** | § | Jury Demanded |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | | |

**PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff, Thomas E. Doughty ("**Plaintiff**") files this action against The Baldwin Group Personal Insurance, LLC f/k/a/ Guided Insurance Solutions, LLC ("GIS") and Live Call Networks, LLC ("LCN") (GIS and LCN together, "Defendants").

## 1. Summary of How Sellers *Illegally* use Telephone Spam to Market their Services/Products to Consumers

1.1. Americans received 87.5 billion spam text messages and 72.2 billion spam calls to their cell phones in 2021. *See The RoboKiller Report 2021 Phone Scam Insights*. Much of this spam also involved scams. In 2021, telephone scammers stole an estimated $40.3 billion from victims. *Id.*

1.2. Telephone Spam with Multiple Parties

1.2.1 Telephone spam can involve one or more parties. How many parties are involved in the telephone spam—and which parties are liable for TCPA violations—depends on how the telephone campaign is arranged. To understand what parties can be involved, it is necessary to understand the following components of any telephone campaign:

**Always present in a telephone campaign:**

- Lead Generator–The party who generates leads or phone numbers to call;
- Caller–The party initiating and sending the call; and
- Seller–The party whose goods or services are being promoted.

**Sometimes present in a telephone campaign:**

- Marketing Broker/Affiliate Network–A party connecting Sellers with Callers.

1.3. If a company generates their own phone numbers to be called, places the calls themselves, and promotes its own services, there is only one party involved. The company acts as Lead Generator, Caller, and Seller.

1.4. If a company hires a call center to promote the company's services and provides the call center with the phone numbers to be called, there are two parties involved. The company acts as Lead Generator and Seller, and the call center acts as Caller.

1.5. If a company wants to promote its services without having to worry about the lead generation or the calling campaign, the company could hire a Lead Generator and a Caller. The Lead Generator will generate phone numbers to be called. The Caller will call the generated phone numbers and promote the company's services. In this arrangement there are three separate parties, each respectively acting as Lead Generator, Caller, and Seller.

1.6. A Seller who wants to promote its services at scale can also hire a Marketing Broker ("Broker"). Brokers go by various names, the most common being "Affiliate Network." When a Seller works with a Broker, the Broker will have one or more Callers who promote the Seller's services in exchange for performance-based commission. For example, for each sale that a Caller generates through the Caller's efforts on behalf of a Seller, a Seller might pay $80 to the Caller and $20 to the Broker.

1.7. When there is a Broker, there are at a minimum three parties involved: Seller, Broker, and Caller. However, there may be multiple Brokers. This happens when a Broker outsources to a second Broker, who outsources to a third Broker, etc., like this:

***Seller → Broker 1 → Broker 2 → Broker 3 → Caller → Lead Generator***

1.8. Sellers and Brokers often outsource to call centers, typically overseas. When these Sellers and Brokers are asked about who sent the text messages or calls that directed the consumer to the Sellers or Brokers, they respond:

"We didn't send the spam. And we won't tell you who did." These Sellers and Brokers often maintain control over their Callers by telling the Callers what lists to call, when trademarks can and cannot be used, whether to scrub against the Do Not Call Registry, what scripts to use, and more. These Sellers and Brokers may thus be vicariously liable for the conduct of their Callers. Yet, without the aid of discovery to uncover the relationships between the Callers, Sellers and Brokers, and what control the Sellers and Brokers exercised over their Callers, it is difficult, if not impossible, to identify all of the appropriate parties at the pleading stage.

1.9. It is also very common for Sellers, Brokers, and Callers to cover for each other's illegal conduct. When consumers complain to Sellers or Brokers about telephone spam, the Sellers and Brokers rarely will sever ties with their Caller(s). Instead, the Sellers and Brokers will only tell the Caller not to call that specific consumer anymore. Sellers and Brokers frequently settle demands they receive that result from the illegal calls or text messages their Callers make on their behalf. They do this to maintain the confidentiality of their Caller's identity and their illegal activity and to maintain their profitable enterprise. The Sellers and Brokers know—or have reason to know—that a Caller is violating the TCPA, but they do nothing about it and keep working with the Caller because it is profitable to

do so. Thus, Sellers and Brokers ratify, and may be vicariously liable for, the illegal conduct of their Callers.

1.10. Often the Sellers, Brokers, and Callers involved in the telephone spam are operated through shell companies, or entities with limited resources, effectively making them judgment proof. Yet, the founders, principals, and executives of these companies are sending, approving, directing, and overseeing the spam. These individuals may thus be individually liable for the illegal conduct of their shell companies. Without the aid of discovery, it is difficult if not impossible to learn who the individuals are that are actually sending, approving, directing, and overseeing the spam.

1.11. In addition to randomly or sequentially generating phone numbers to call, Callers buy lists of phone numbers from Lead Generators. Sometimes, these lists of phone numbers are created from data stolen during a data breach event, meaning the individuals on these lists never consented to be on such lists in the first place. When selling leads, Lead Generators rarely, if ever, scrub against the National Do Not Call Registry and thus they illegally sell consumers' information.

1.12. The calls received by the Plaintiff in this case have all the indicators of the illegal telemarketing described above.

**2. Parties.**

2.1. Plaintiff is, and at all times mentioned herein was, a citizen and resident of this District.

2.2. Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

2.3. Plaintiff is, and at all times mentioned herein was, a "person" as defined by Tex. Bus. & Com. Code § 1.201(b)(27).

2.4. Plaintiff is, and at all times mentioned herein was, a "purchaser" as defined by Tex. Bus. & Com. Code § 302.001(3).

2.5. Defendant The Baldwin Group Personal Insurance, LLC f/k/a/ Guided Insurance Solutions, LLC is a business entity with principal place of business and mailing address of 4211 W. Boy Scout Blvd, Suite 800, Tampa, FL 33607. GIS has appeared in this action.

2.6. Defendant Live Calls Network, LLC ("LCN") is a business entity with principal place of business in Maryland__________________________.

2.7. According to the Maryland Secretary of State, LCN is an active Maryland limited liability company.

2.8. Defendants are and at all times mentioned herein were, a "person" as defined by 47 U.S.C. § 153 (39).

2.9. Defendants are and at all times mentioned herein were, a "person" as defined by Tex. Bus. & Com. Code § 1.201(b)(27).

2.10. Defendants are and at all times mentioned herein were, a "seller" as defined by Tex. Bus. & Com. Code § 302.001(5).

**3. Jurisdiction and Venue.**

3.1. The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Financial Services, LLC*, 132 S. Ct. 740 (2012).

3.2. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a), because they are so closely related to the federal claims that they form a single case or controversy.

3.3. This Court has personal jurisdiction over Defendants because Defendants called a resident of Texas and Defendants make numerous calls to other residents of Texas.

3.4. Defendants are aware that they are calling residents of Texas and dialing into the State of Texas. Defendants took these actions to establish contacts with the State of Texas.

3.5. Venue is proper because the Plaintiff is a resident of this District and Defendants have sufficient contacts in this State and District to subject it to personal jurisdiction. As set forth above, Defendants targeted residents of this District and made calls into this State.

**4. Nature of Suit**

4.1. As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Political Consultants,* 140 S. Ct. 2335, 2343 (2020). "The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress and state legislatures have been fighting back." *Id.*

4.2. This action arises out of Defendants' practice of making pre-recorded telemarketing calls to individuals on the National Do-Not-Call Registry without prior express written consent (or any consent whatsoever), in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. ("TCPA") and provisions of the Texas Business & Commerce Code.

4.3. Plaintiff's telephone numbers were registered on the National Do-Not-Call Registry at the time of the calls and was so registered for more than 31 days prior to the calls.

## 5. The Law Regarding Robocalls

5.1. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy

[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

5.2. The TCPA makes it unlawful to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service or that is charged per the call. *See* 47 U.S.C. § 227(b)(1)(A)(iii).

5.3. The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A) or 47 U.S.C. § 227(b)(1)(B). *See* 47 U.S.C. § 227(b)(3).

5.4. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

5.5. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of

> the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.[]"

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012).

**6. The National Do Not Call Registry**

6.1. The national Do Not Call Registry (the "Registry") allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

6.2. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential and wireless telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

6.3. The regulations exempt from liability a caller who has obtained the subscriber's signed, written agreement to receive telephone solicitations from the caller. 47 C.F.R. § 64.1200(c)(2)(ii). That agreement must also include the telephone number to which the calls may be placed. *Id.*

6.4. The Federal Communications Commission found that it "must mandate procedures for establishing company-specific do-not-call lists to ensure effective compliance with and enforcement of the requirements for protecting consumer privacy." *Id.* at ¶ 24.

6.5. These regulations are codified in part at 47 CFR 64.1200(d)(1)-(7).

6.6. Specifically, these regulations require a company to provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, **and a telephone number or address at which the person or entity may be contacted.** 47 CFR 64.1200(d)(4) (emphasis added).

6.7. These policies and procedures prohibit a company from making calls for telemarketing purposes[1] unless they provide the required information. 47

[1] The distinction between the use of "telephone solicitation" in relation to the national do-not-call database and calls for "telemarketing purposes" in relation to the company-specific do-not-call list is significant. "Telephone solicitation" excludes calls made to a person with whom the company has as established business relationship, 47 CFR 64.1200(f)(14), which can be established by a "voluntary two-way communication". 47 CFR 64.1200(f)(5). But this business relationship can be terminated by a "do not call" request. 47 CFR 64.1200(f)(5)(i). "Telemarketing purposes", on the other hand, includes any calls made for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, regardless of any consent or established business relationship. 47 CFR 64.1200(f)(12). In other words, prior to making any telemarketing calls to anyone, regardless of relationship, a company must implement the company-specific do-not-call regulations, but it only need to comply with the national do-not-call registry provisions with respect to persons with whom it does not have an existing established business relationship.

CFR 64.1200(d).

6.8. Accordingly, all telemarketing calls violate the TCPA, unless Defendants can demonstrate that it has provided the required information on each of the calls.

6.9. There is a private right of action to enforce 47 C.F.R. § 64.1200(d) through § 227(c):

> [S]ection 227(c)(5)… empowers 'any person' to sue for damages and injunctive relief for do-not-call violations 'by or on behalf of' a company. In accordance with this statutory provision, the Commission's company-specific do-not-call rules provide that '[n]o person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity[.]' 47 C.F.R. § 64.1200(d).

*In re Dish Network*, 28 FCC. Rcd. 6574, ¶ 29 (2013).

6.10. These requirements are separate but cumulative. In other words, a company must comply with both the required information and comply with the national "do not call" database regulations. A failure to comply with either is distinct a violation of 47 U.S.C. § 227(c).

6.11. Though some of these requirements mention "residential" telephones, they were all extended to cover calls to cellular telephones as well as residential telephones. 47 CFR § 64.1200(e).

6.12. Further, a person or entity can be liable for calls made on its behalf

in violation of the TCPA, even if that person or entity did not directly dial such calls. *See, e.g., In re Rules & Regs. Implementing the TCPA*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995) (explaining that the FCC's "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any [TCPA] violations"). In fact, in May 2013, the FCC issued a binding declaratory ruling clarifying that sellers "may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers . . . under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In re Joint Petition Filed by DISH Netowrk, LLC et al. for Declarator Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6584 ¶28 (2013).

6.13. Accordingly, an entity can be liable under the TCPA for a prohibited call made on its behalf under a number of theories including vicarious liability. Under those circumstances, including as described herein as to Defendants, the seller is properly deemed to have initiated the call through the person or entity that actually placed the call.

**7. Spoofing is Illegal**

7.1. The regulations enforcing and interpreting the TCPA, also require that any person or entity that engages in telemarketing must transmit caller

identification information.[2] 47 C.F.R. § 64.1601(e). **This prevents a telemarketer from "spoofing" (using a false identification for their marketing calls) the telephone number from which the telemarketing call is made. Additionally, the regulations require telemarketers to** provide the name of the telemarketer when available by the telemarketer's carrier and the seller's customer service number.

7.2. Here Defendants did not comply with the requirements of 47 C.F.R. § 64.1601(e) as they provided incorrect information regarding the number from which the calls were being made.

## 8. Texas' Anti Solicitation and Robo-Calling Statutes

8.1. Section 302.101 of the Texas Business & Commerce Code prohibits sellers from engaging in telephone solicitation from a location in this state or to a purchaser located in this state unless the seller obtains a registration certificate from the Office of the Secretary of State for the business location from which the solicitation is made.

8.2. Sellers engaging in telephone solicitations are required to register, and among other things, list "each telephone number to be used by the seller and the address where each telephone using the number is located."

---

[2] The information required is: (1) the calling party number, "CPN" or automatic numbering information, "ANI"; and (2) the name of the telemarketer. 47 C.F.R. § 64.1601(e).

§302.151(10).

8.3. Section 302.302(a) of the Texas Business & Commerce Code provides that a person who violates this chapter is subject to a civil penalty of no more than $5,000 for each violation. Furthermore, section 302.302(d) provides that the party bringing the action is also entitled to recover all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorneys' fees.

8.4. Pursuant to section 305.053(a) of the Texas Business & Commerce Code, a person who receives a communication that violates 47 U.S.C. § 227, or a regulation adopted under that provision, may bring an action against the person who originates the communication for an injunction, damages or both.

**9. General Factual Allegations**

9.1. Plaintiff is the user of his cell phone number (XXX) XXX-0995 and his cell phone number (XXX) XXX-0292 (together the "Telephone Numbers").

9.2. The Telephone Numbers are residential cellular numbers and Plaintiff uses them for residential purposes. They are not business numbers.

9.3. Plaintiff's cellular Telephone Numbers are telephone numbers assigned to a cellular telephone service.

9.4. The Telephone Numbers have been on the National Do-Not-Call Registry since September 11, 2007 and January 17, 2022, respectively. Plaintiff

placed the Telephone Numbers on the National Do-Not-Call Registry.

9.5. Plaintiff did not provide prior express written consent (or any consent) to Defendants for the calls made by Defendant to Plaintiff.

9.6. GIS provides auto, property, business, life, health & Medicare insurance to consumers. GIS' website states it is licensed in Texas. There, however, are no listings for Guided Insurance Group, LLC registered under the Texas Insurance Code. Guided Insurance Group, LLC could be found with a search at https://txapps.texas.gov/NASApp/tdi/TdiARManager. Therefore, upon information and belief, GIS is not "a person who holds a license issued under the [Texas] Insurance Code."[3] Live Call Networks, LLC is not "a person who holds a license issued under the [Texas] Insurance Code.

9.6.1.

9.7. GIS or Live Call Network placed at least 6 calls to Plaintiff on the Telephone Numbers phones ending in 0292 and 0995 in a twelve-month period, attempting to sell Plaintiff automobile insurance, property insurance and health insurance policies.

9.8. The callers used deceptive tactics and generic names in an effort to conceal

---

[3] The Baldwin Group Personal Insurance, LLC was found with a search at https://txapps.texas.gov/NASApp/tdi/TdiARManager. Whether its registration satisfies the exemption for GIS is in dispute.

their illegal activity and identity. For example, the calls used fictious names with generic terms like "Insurance Services" so that the recipient of a call would be unable to link the calls back to, or identify, the company engaged in the illegal marketing activity.

9.9. Call One. "Dave Smith," an employee, representative or agent of GIS or Live Call Network, called Plaintiff on 06/08/2022 at 10:11am CST from spoofed phone number (412) 293-3736. This phone number is not in service. A prerecorded voice on the call stated the call was from "Insurance Services."

9.9.1. "Dave Smith" stated in part "Hello. Hi, my name is Dave Smith, and I'm calling from Insurance Services. And the reason for my call today is because we partnered with the country's top auto insurance providers, and we're looking to save you up to 30% on what you're currently paying. You are currently paying for auto insurance, correct?"

9.10. Call two. "Shaun," an employee, representative or agent of GIS or Live Call Network, called Plaintiff on 06/08/2022 at 1:10pm CST from spoofed phone number (215) 714-7165. This phone number is not in service. A prerecorded voice on the call stated the call was from "Insurance Services."

9.10.1. "Shaun" stated in part: "Hello. Hi, my name is Shaun, and I'm

calling from Insurance Services, and the reason for my call today— is because we partnered with the country's top auto insurance providers— and we're looking to save you up to 30% on what you're currently paying. You are currently paying for auto insurance, correct?"

9.11. Call three. "Shaun" again called Plaintiff on 06/08/2022 at 3:59pm CST from spoofed phone number (717) 619-9235. This phone number is not in service. A prerecorded voice on the call stated the call was from "Insurance Services."

9.11.1. "Shaun" stated in part: "Hello. Hi, my name is Shaun, and I'm calling from Insurance Services, and the reason for my call today is because we partnered with the country's top auto insurance providers, and we're looking to save you up to 30% on what you're currently paying. You are currently paying for auto insurance, correct?

9.12. Call four. "Shaun" again called Plaintiff on 06/09/2022 at 10:43am CST from spoofed phone number (272) 200-4231. This phone number is not in service. A prerecorded voice on the call stated the call was from "Insurance Services."

9.12.1. "Shaun" stated in part: "Hello. Hi, my name is Shaun, and I'm calling from Insurance Services, and the reason for my call today is because we partnered with the country's top auto insurance providers,

and we're looking to save you up to 30% on what you're currently paying. You are currently paying for auto insurance, correct?"

9.12.2. In an attempt to find out who was calling him, Doughty gave "Shaun" some information that was incorrect but could be used to determine who received the incorrect information from "Shaun." Doughty took such action in an attempt to identify the caller, because he was unable to do so by searching the telephone numbers or find any company called "Insurance Services."

9.12.3. "Shaun" stated he entered Doughty's information into his website, and Doughty would be called back by an insurance rate specialist.

9.13. Call five. "Alex," an employee, representative or agent of Live Call Network or GIS, called Plaintiff on 06/09/2022 at 4:05pm CST from spoofed phone number (215) 862-0090. This phone number is not in service. Alex stated he was "from LCN [Live Call Networks] on a recorded line." During this call, "Alex" asked Plaintiff to verify certain personal information, which Plaintiff agreed was correct, but was in fact, was not correct, in order to protect Plaintiff's identity and personal identification information. The information "Alex" gave Doughty was the incorrect information that Dought gave "Shaun" on the 06/09/2022, 10:43am CST call. This shows "Alex" had a relationship with "Shaun." This further shows that the campaign was designed to conceal the identity of the first

caller, as during the call back, it was revealed that the calls were associated with LCN.

9.14. "Alex" said Plaintiff had requested information from the "oneinsurancerates.com" website.

9.15. Plaintiff had never heard of or visited the website "oneinsurancerates.com" before.

9.16. Plaintiff never requested any information from, or quotes for, auto, property or health insurance from "oneinsurancerates.com."

9.17. "Alex" further provided information to Plaintiff including a home address, home ownership status, date of birth, marital status, email address and Plaintiff's vehicle make and model, which was, again, all inaccurate, and was the result of the information Doughty provided to "Shaun" , as discussed above in an attempt to identify the caller. Plaintiff "played along" with "Alex" in order to ascertain the true identity of the callers who have been calling Plaintiff multiple times without his permission or consent. It was clear to Doughty that the parties were working together and sharing information between one another.

9.18. "Alex" then transferred Plaintiff to "Sabrina" at quotewizard.com who then repeated some of the incorrect information that "Alex" quoted previously and which "Alex" had received from "Shaun." Plaintiff continued to confirm the incorrect information was accurate in order to

identify the agency generating the calls. The fact that "Sabrina" had the information further confirms that the parties were engaged in coordinated conduct to generate leads illegally.

9.19. "Sabrina" then transferred Plaintiff to Christopher Marshall, an employee of GIS, who then took over the call.

9.20. Christopher Marshall identified himself as a licensed agent of Defendant. Once Plaintiff realized he had sufficient information to identify the agent and his company, Plaintiff ended the call.

9.21. Christopher Marshall attempted to call Plaintiff back immediately on 06/09/2021 at 4:16pm CST from (980) 500-8702. Plaintiff rejected the call as Plaintiff believed he had sufficient information to identify the agent and his company that were responsible for the numerous unwanted calls he received.

9.22. Plaintiff never sought information about an auto, property or health insurance policy and did not consent to the calls from GIS or its caller.

9.23. These calls were spoofed, i.e., made from multiple non-working phone numbers using false caller ID identifications (CID) in order to prevent Plaintiff from discovering the Defendant's real identity, in case the recipients of these calls were to object to being called, and to avoid being subjected to a lawsuit, such as the Plaintiff's current suit.

9.24. On each of the first 4 calls listed above, Plaintiff answered the call

and heard a lengthy pause, then a "bloop" sound, then a prerecorded and/or artificially created voice, indicating to him that the call was made using an automatic telephone dialing system along with a prerecorded or artificially created voice. On Call #5, Plaintiff experienced a lengthy delay before the "Alex" was heard.

9.25. Upon information and belief, Defendant GIS authorized and compensated the individuals allegedly identified on the calls to solicit and generate prospective customers and transfer those customers to GIS employees.

9.26. "Dave Smith" and "Shaun" used GIS' computers system and entered information about Plaintiff into the computer system. When the call was transferred to GIS, GIS agents could see the information in the GIS computer system regarding Plaintiff.

9.27.

9.28. This calling pattern has all indications of lead generation described above.

9.29. Plaintiff was physically located in Texas when he received the calls described above.

9.30. Prior to receiving the calls Plaintiff had no established business relationship with Defendants. To this day Plaintiff does not have an established business relationship with Defendants.

9.31. Defendants knowingly violated the TCPA and the Texas Business & Commerce Code TCPA when makingthe calls to Plaintiff and Defendant's violations were willful.

9.32. Defendants went to great lengths to conceal their identity, and the identities of its contracted callers.

9.33. The calls were not made for emergency purposes.

9.34. Defendants have failed to register pursuant to § 302.101 of the Texas Business & Commercial Code to provide telephone solicitations.

10. **Defendants' Liability**

10.1. Plaintiff was harmed by Defendants' actions of calling his residential cellular phone while his number was on the national Do Not Call Registry, without consent, in the following manners:

10.1.1. Plaintiff's privacy was invaded by Defendants;

10.1.2. Plaintiff was harassed and abused by Defendants' telephone calls;

10.1.3. Defendants' calls were a nuisance to Plaintiff;

10.1.4. Defendants' calls used the battery on Plaintiff's cell phone and Plaintiff had to pay to recharge the battery;

10.1.5. Plaintiff's phone was unavailable for other use while processing the illegal calls from Defendants;

10.1.6. Defendants illegally seized Plaintiff's telephone line while makingthe illegal calls to Plaintiff's cellular telephone;

10.1.7. Plaintiff's telephone line was occupied by multiple unauthorized calls from Defendants;

10.1.8. Defendants' seizure of Plaintiff's telephone line was intrusive; and

10.1.9. Plaintiff was inconvenienced by Defendants' calls, by among other things, hearing his phone ring and having to check the calling party.

10.2. These forms of actual injury are sufficient for standing and jurisdictional purposes.

11. **Agency and Vicarious Liability**

11.1. GIS retained and authorized the entity for which Dave Smith and Shaun worked ("LCN" or the "Call Center") to generate prospective customers and sales leads for GIS through outbound telephone solicitations concerning GIS' products and/or services.

11.2. The calls made by Call Center were made for GIS' benefit and for the purpose of identifying consumers interested in purchasing GIS' products or services and delivering those consumers to GIS as sales leads.

11.3. GIS and the Call Center did not operate through a mere arm's-length purchase and sale of unidentified leads. Rather, GIS and the Call Center utilized a common and/or integrated computer system or customer-

relationship-management system ("CRM") through which the call center transmitted information concerning prospective customers directly to GIS.

11.4. GIS authorized the Call Center and its personnel to access that computer system and to enter consumer information directly into the system for GIS' use.

11.5. When the Call Center contacted Plaintiff, its representative entered information concerning Plaintiff directly into the shared CRM/computer system, including Plaintiff's identity, telephone number, and information obtained from Plaintiff during the telemarketing call.

11.6. GIS had access to that information and was capable of viewing information entered by the Call Center concerning Plaintiff. The information was therefore available to GIS as part of the same lead-generation and sales process in which the Call Center was acting.

11.7. GIS' authorization permitting the Call Center to enter prospective-customer information directly into a system accessible to GIS demonstrates that GIS knowingly integrated the Call Center into GIS customer-acquisition process and authorized the Call Center to act on GIS' behalf in obtaining prospective customers.

11.8. GIS' access to the information entered by the Call Center also gave GIS the ability to monitor the leads being generated for it, including the identity of prospective customers and the information obtained from them by the Call Center.

11.9. GIS thereby possessed both the practical ability and the right to monitor the Call Center' performance in generating leads for GIS and to determine whether to accept, reject, pursue, or otherwise act upon leads generated by the Call Center.

11.10. GIS knowingly accepted leads generated by the Call Center, including Plaintiff's lead, and used or intended to use those leads for the purpose of selling GIS' products or services.

11.11. By engaging the Call Center to generate customers for GIS, providing or permitting access to GIS' sales/customer systems, permitting the Call Center to enter prospective-customer information directly into those systems, monitoring and receiving the resulting leads, and accepting the commercial benefits of the calls, GIS manifested its assent that the Call Center act on GIS' behalf in generating customers and leads.

11.12. The Call Center, in turn, accepted that relationship and acted on GIS' behalf by soliciting prospective customers, obtaining information from those consumers, and entering that information into the system used by GIS so that GIS could pursue the resulting sales opportunities.

11.13. Accordingly, the Call Center acted with actual authority as GIS' agent when it placed the calls to Plaintiff.

11.14. GIS additionally ratified the Call Center's conduct by knowingly receiving and accepting the fruits of the Call Center's telemarketing campaign.

11.15. GIS had access to the CRM/computer system into which the Call Center entered the information obtained from the consumers it called, including Plaintiff.

11.16. GIS knew that Plaintiff's information had been provided to GIS as a result of the Call Center's solicitation activities and nevertheless accepted, retained, and/or acted upon Plaintiff's information as a sales lead.

11.17. GIS did not reject or repudiate the lead or otherwise disassociate itself from the conduct through which the lead was generated, but instead accepted the commercial benefit of the call-center's activities.

11.18. GIS also knew or reasonably should have known that the Call Center was making telephone solicitations in violation of the TCPA, but nevertheless continued accepting leads generated through those calls and failed to take effective action to stop the unlawful calling.

11.19. GIS therefore ratified the Call Center's conduct by knowingly accepting and retaining the benefits of the telemarketing campaign after acquiring knowledge of the material circumstances surrounding the calls.

**12. Class Action Allegations.**

12.1. The proposed Classes satisfy the requirements for a class action.

12.2. Plaintiff brings the claims for relief alleged in this petition pursuant to Rule 23 on behalf of himself and classes defined as follows:

12.2.1. "Texas § 302.101 Class"

12.2.1.1. Since four years before the date of the filing of this Complaint through the date of certification, Plaintiff and all residents of the State of Texas to whose telephone number Defendant placed (or had placed on their behalf) a telephone solicitation when Defendants did not hold a registration certificate as required by Tex. Bus. & Com. Code § 302.101.

12.2.2. "Texas § 305.053 Class"

12.2.2.1. Since four years before the date of the filing of this Complaint through the date of certification, Plaintiff and all residents of the State of Texas, to whose telephone number Defendant: (1) placed (or had placed on their behalf) a call in violation of 47 U.S.C. § 227 or a regulation adopted under that provision.

12.2.3. "TCPA 227(c) Class"

12.2.3.1. Since four years before the date of the filing of this Complaint through the date of certification, Plaintiff and all persons within the United States to whose telephone number Defendants placed (or had placed on their behalf) two or more telemarketing calls in a 12-month period when the telephone number to which the telephone calls were made was on the National Do-Not-Call Registry at the time of the calls.

12.2.4. "TCPA Information Class"

12.2.4.1. Since four years before the date of the filing of this Complaint through the date of certification, Plaintiff and all persons within the United States to whose telephone number Defendant placed (or had placed on their behalf) two or more telemarketing calls in a 12-month period and did not provide a telephone number or address at which the caller could be contacted.

12.2.5. "TCPA 227(b) Class"

12.2.5.1. Since four years before the date of the filing of this Complaint through the date of certification, Plaintiff and all persons within the United States to whose telephone number Defendant placed (or had placed on its behalf) a prerecorded or artificial voice telemarketing call.

12.2.6. The Texas § 302.101 Class, the Texas § 305.053 Class, the TCPA 227(c), the TCPA 227(b) Class and the TCPA Information Class are collectively referred to herein as the "Classes."

12.2.7. The following persons are excluded from the Classes:

12.2.7.1. (i) the judge(s) assigned to this case and his or her staff;

12.2.7.2. (ii) governmental entities;

12.2.7.3. (iii) Defendants and their affiliates; and

12.2.7.4. (iv) persons who have previously released Defendants of the claims raised by this case.

12.3. The Members of the Classes for whose benefit this action is brought are so numerous that joinder of all members is impracticable.

12.4. The exact number and identities of the persons who fit within the Classes are ascertainable in that Defendants and third parties maintain written and electronically stored data showing:

12.4.1. The time period(s) during which Defendants placed their calls;

12.4.2. The telephone numbers to which Defendants placed their calls;

12.4.3. The telephone numbers for which Defendants had prior express written consent;

12.4.4. The purposes of such calls; and

12.4.5. The names and addresses of Class members.

12.5. The Classes are comprised of hundreds, if not thousands, of individuals.

12.6. There are common questions of law and fact affecting the rights of the Members of the Classes, including, *inter alia*, the following:

12.6.1. Whether Defendants (or someone acting on their behalf) makes solicitations and telemarketing calls to telephone numbers registered on the National Do-Not-Call Registry;

12.6.2. Whether Defendants (or someone acting on their behalf) makes solicitations and telemarketing calls to telephone numbers using a prerecorded voice;

12.6.3. Whether Defendants had the requisite registration certificate as required by Tex. Bus. & Com. Code § 302.101 when making telephone solicitations;

12.6.4. Whether Defendants spoofed the telephone numbers from which it was calling;

12.6.5. Whether Plaintiff and the Classes were damaged thereby, and the extent of damages for such violations; and

12.6.6. Whether Defendants should be enjoined from engaging in such conduct in the future.

12.7. Plaintiff is a member of the Classes in that Defendants placed two or more telemarking calls to his phone in a one-year period when his telephone

number was on the National Do-Not-Call Registry and while using a prerecorded voice.

12.8. Plaintiff's claims are typical of the claims of the Members of the Classes in that they arise from Defendants' uniform conduct and are based on the same legal theories as these claims.

12.9. Plaintiff and all putative Members of the Classes have also necessarily suffered concrete harm in addition to statutory damages, as all Members of the Classes spent time tending to Defendants' unwanted calls and suffered a nuisance and an invasion of their privacy.

12.10. Plaintiff has no interests antagonistic to, or in conflict with, the Classes.

12.11. Plaintiff will thoroughly and adequately protect the interests of the Classes, having retained qualified and competent legal counsel to represent him and the Classes.

12.12. Defendants have acted and refused to act on grounds generally applicable to the Classes, thereby making injunctive and declaratory relief appropriate for the Classes.

12.13. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications.

12.14. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since, *inter alia*, the damages suffered by each class member make individual actions uneconomical.

12.15. Common questions will predominate, and there will be no unusual manageability issues.

## 13. FIRST CAUSE OF ACTION -Violations of the TCPA, 47 U.S.C. § 227(b) (On Behalf of Plaintiffs and the TCPA 227(b) Class)

13.1. Plaintiff and the proposed TCPA 227(b) Class incorporate the foregoing allegations as if fully set forth herein.

13.2. Defendants placed, or had placed on their behalf, prerecorded telemarketing telephone calls to Plaintiff's and TCPA 227(b) Class Members' cellular telephone numbers without prior express written consent.

13.3. Defendants therefore violated 47 U.S.C. § 227(b).

13.4. As a result of Defendants' unlawful conduct, Plaintiff and TCPA 227(b) Class Members are entitled to an award of $500 in statutory damages for each call, pursuant to 47 U.S.C. § 227(b)(3)(B).

13.5. Plaintiff and the TCPA 227(b) Class Members are entitled to an award of treble damages in an amount up to $1,500 for each call made knowingly and/or willfully, pursuant to 47 U.S.C. § 227(b)(3).

## 14. SECOND CAUSE OF ACTION - Violations of the TCPA, 47 U.S.C. § 227(c) (On Behalf of Plaintiff and the TCPA 227(c) Class)

14.1. Plaintiff and the proposed TCPA 227(c) Class incorporate the foregoing allegations as if fully set forth herein.

14.2. Defendants placed, or had placed on their behalf, telemarketing telephone calls to Plaintiff's and TCPA 227(c) Class Members' residential telephone numbers.

14.3. Plaintiff's and TCPA 227(c) Class Members' telephone numbers were all on the National Do-Not-Call Registry at the time of calls.

14.4. Plaintiff and TCPA 227(c) Class Members each received two or more such calls in a 12-month period.

14.5. Plaintiff and TCPA 227(c) Class Members are entitled to an award of $500 in statutory damages for each call pursuant to 47 U.S.C. § 227(c)(5).

14.6. Plaintiff and TCPA 227(c) Class Members are entitled to an award of treble damages in an amount up to $1,500 for each call made knowingly and/or willfully, pursuant to 47 U.S.C. § 227(c)(5).

**15. THIRD CAUSE OF ACTION - Violations of the TCPA, 47 U.S.C. § 227(c) (On Behalf of Plaintiff and the TCPA Information Class)**

15.1. Plaintiff and the proposed TCPA Policy Class incorporate the foregoing allegations as if fully set forth herein.

15.2. Defendants placed, or had placed on their behalf, two or more telemarketing telephone calls to Plaintiff's and the putative TCPA Information Class Members' residential telephone numbers in a 12-month period

15.3. Defendants did so despite not providing a telephone number or address at which the person or entity making the call could be contacted.

15.4. Thus, Defendants did so without complying with the TCPA's identification and disclosure requirements. 47 C.F.R. § 64.1200(d)(4).

15.5. Plaintiff and the putative TCPA Information Class Members are entitled to an award of $500 in statutory damages telephone call pursuant to 47 U.S.C. § 227(c)(5).

15.6. Plaintiff and the putative TCPA Information Class Members are entitled to an award of treble damages in an amount up to $1,500 telephone call, pursuant to 47 U.S.C. § 227(c)(5).

**16. FOURTH CAUSE OF ACTION - Violations of Texas Business and Commerce Code, § 302.101 (On Behalf of Plaintiff and the Texas § 302.101 Class)**

16.1. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

16.2. Defendants failed to obtain a registration certificate from the Office of the Secretary of State of Texas pursuant to § 302.101 of the Texas Business and Commerce Code.

16.3. Defendants placed telephone solicitations to Plaintiff's and the Texas § 302.101 Class Members' telephone numbers.

16.4. Defendants' telephone solicitations were made from a location in Texas or to Plaintiff and the Texas § 302.101 Class Members located in Texas.

16.5. Plaintiff and the Texas § 302.101 Class Members are entitled to an award of up to $5,000 for each violation and all reasonable cost of prosecuting the action, including court costs and investigation costs, deposition expenses, witness fees, and attorney's fees.

## 17. FIFTH CAUSE OF ACTION – Violations of Texas Business and Commerce Code, § 305.053 (On Behalf of Plaintiff and the Texas § 305.053 Class)

17.1. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

17.2. Defendants placed in a 12-month period at least one and many times more than one telemarketing telephone calls to Plaintiff's and the Texas § 305.053 Class Members' respective telephone numbers.

17.3. Each of these calls violated 47 U.S.C. § 227 or a regulation adopted under that provision.

17.4. Plaintiff and the Texas § 305.053 Class Members are entitled to:

17.4.1. a permanent injunction to prevent any further violations of the Texas Business & Commerce Code, Chapter 305;

17.4.2. the greater of $500 for each violation or Plaintiff's actual damages (*see* Tex. Bus. & Com. Code §304.053(b);

17.4.3. the greater of $1,500 for each violation or Plaintiff's actual damages for each call made knowingly or intentionally (*see* Tex. Bus. & Com. Code §304.053(c).

**18. Prayer for Relief**

18.1. Plaintiff prays for the following relief:

18.1.1. An order certifying the Classes as defined above, appointing Plaintiff as the representatives of the Classes and appointing Plaintiff's counsel as Class Counsel;

18.1.2. An order declaring that Defendants' actions, as set out above, violate the TCPA and the Texas Business and Commerce Code because they are a violation of 47 U.S.C. §§ 227 (c), 47 C.F.R. §§64.1200(c)(4) and/or 47 C.F.R. § 64.1601(e);

18.1.3. An order declaring that Defendants' actions, as set out above, violate Tex. Bus. & Com. Code § 302.101.

18.1.4. An award of statutory damages under the Texas Business and Commerce Code;

18.1.5. An award of treble damages;

18.1.6. An award of reasonable attorneys' fees and costs, including the costs set forth pursuant to Tex. Bus. & Com. Code § 302.302(d); and

18.1.7. All other relief, in law and in equity, to which Plaintiff may be entitled.

## 19. Jury Demand

19.1. Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

By: */s/ Chris R. Miltenberger*
Chris R. Miltenberger
Texas Bar Number: 14171200

**The Law Office of Chris R. Miltenberger, PLLC**
1360 N. White Chapel, Suite 200
Southlake, Texas 76092-4322
817-416-5060 (office)
817-416-5062 (fax)
chris@crmlawpractice.com

Max S. Morgan, Esquire
THE WEITZ FIRM, LLC
1515 Market Street, #1100
Philadelphia, PA 19102
Tel: (267) 587-6240
Fax: (215) 689-0875
max.morgan@theweitzfirm.com

**Attorneys for Plaintiff**

### Certificate of Service

The undersigned certifies that the foregoing document was filed electronically through the Court's CM/ECF system in compliance with the Local Rules.

By: *\/s\/ Chris R. Miltenberger*
Chris R. Miltenberger